[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The Plaintiff Joseph Whiting brings this action for a declaratory judgment and for an injunction to prevent the defendant Hamden Board of Education from eliminating a sibling preference policy for admitting pupils to the Wintergreen Interdistrict Magnet School ("WIMS").[1]
The named plaintiff is joined by eight other plaintiffs. Each plaintiff is the parent of a child who was selected to be a pupil at WIMS for the ("current") 1998-1999 school year, the first year of operation for WIMS. Each plaintiff also has at least one other child who has applied for admission to WIMS for the ("upcoming") 1999-2000 school year.
The defendants are the Hamden Board of Education and each of its members, and Alida Begina, the Superintendent of Schools in Hamden, and Mary Marindino, the Assistant Superintendent. The Superintendent and Assistant Superintendent act as agents in carrying out the policies of the Board.
For the current school year, a sibling preference policy was utilized in the selection of pupils for WIMS, a magnet school to which all elementary school students in Hamden are entitled to apply. The Hamden Board of Education voted on December 3, 1998, to eliminate any preference in admissions for the siblings of pupils at WIMS. The elimination of the sibling preference policy will place the eligible siblings of current pupils in a random applicant pool for the available slots for the upcoming year, rather than affording a preferential status to the application of CT Page 4930 the sibling.
The lawsuit is brought in three counts. Count I alleges that the plaintiff families each decided to enroll one of their children in WIMS relying on written and oral statements from the defendants that the remaining siblings would be entitled to enroll; and that having induced the plaintiffs to take such action the Board is estopped from eliminating the sibling preference policy. Count II alleges that the Board was without authority to change the criteria for student selection for WIMS, because the Board had ceded that authority to the WIMS Steering Committee, the entity that governed the school. Count III alleges that an agent of the Board made false statements that induced the Board at a public hearing to vote to eliminate the policy.
FACTS
The Wintergreen Interdistrict Magnet School is a public school located in Hamden, comprised of kindergarten through fourth grade. It is an interdistrict school, accepting pupils from Hamden, New Haven, Wallingford, and Woodbridge. There are no special admissions requirements or entrance exams. All children residing in the four towns are eligible for admission to the appropriate grade at WIMS instead of attending the school in their district to which they would ordinarily be assigned. Beginning with the upcoming year, the school will add grades five through eight.
The formation of WIMS resulted from the convergence of three issues in Hamden: the overcrowding in the elementary and middle schools; the existence of the largely empty school building in Hamden in which WIMS is now housed; and the desire to experiment with an innovative curriculum developed by the Edison Project, a private educational consulting firm. Hamden could not afford to reopen the old Wintergreen School on its own, however, and the idea of inviting other area towns to participate (and provide per-pupil funding) in opening it as a magnet school was born.
In order to approve the operation of such a school and provide funding for it, the State Board of Education requires the submission of a plan of operation and an interdistrict agreement among the participating local boards of education. With the assistance of the Edison Project, these materials were developed during 1997. The four partner school districts decided to designate Area Cooperative Education Services ("ACES"), a CT Page 4931 regional education services center authorized pursuant to Conn. Gen. Stat. § 10-66a et seq, to be the local educational agency for WIMS.[2]
The Hamden Board of Education approved the Plan of Operation of the Wintergreen Interdistrict Magnet School on November 12, 1997. On the same date, the Board approved, and the Chair of the Board signed, the interdistrict Agreement among the four partner boards of education. These documents were thereafter approved by the State Board of Education.
The Plan of Operation and the interdistrict Agreement provide for the school to have a Steering Committee comprised of representatives from the four partner boards of education, and the Executive Director of ACES. The Agreement provides as follows:
 ¶ IV. A. 4. a. Policies of ACES will be used as the basis of operation for the school.
 b. New policies required to meet unique needs of the school will be reviewed/acted upon by the Steering Committee prior to ACES governing Board action.
As to the policy regarding pupil selection, the Agreement provides:
 ¶ IV. D. The partner school districts agree to . . . ensure that the students sent reflect the gender and racial distribution of the district — and, if necessary, due to the number of requests, cooperate in a lottery to choose students in accordance with the categories listed.
The Plan of Operation provides an identical structure for school governance:
¶ II. A. 1 . . . . The Steering Committee, comprised of representatives from each district, will be established to allow the partner districts to be integrally involved with the operation of the school program and to serve as a communications vehicle to regularly disseminate information to the participating districts. The Steering Committee will approve staffing patterns, establish the annual budget and per-pupil tuition, approve major curiculum [sic] changes, and review student and program assessment data. CT Page 4932
As to the policy regarding pupil selection, the original Plan of Operation provides:
 ¶ V.A Each of the participating school districts will be allotted a number of seats at the school, by grade level, as described under Section III.A. In addition each district will be required to meet certain diversity goals, by grade level. In the event that applications for a particular district, grade and diversity category exceed the number of seats available, a random lottery will be conducted to determine the students to be admitted to the School.
and
 ¶ V.F. Families may submit applications for more than one sibling as a part of the application process. In the event that any one sibling is selected through the random lottery, all of the siblings will be invited to enroll in the school. In subsequent years, if a younger sibling becomes of school age, that child will be admitted to any vacant seats that may exist at the school.
Beginning with the current year — its first year of operation, WIMS received many more applications from Hamden than spaces available for Hamden pupils. The result was the necessity to hold a lottery to select among Hamden applicants for available slots.
For the 1998-1999 school year, under the interdistrict Agreement, Hamden was allocated 249 slots among all the classes for grades K-4, about 50 students per grade. Hamden school officials decided to reserve the first 105 slots for pupils whose "home" schools suffered from overcrowding. The next 83 slots were allocated to siblings. The last 61 slots were filled at random from among the remaining applications for each grade.
While 83 siblings of Hamden pupils were admitted to WIMS for the current year through the use of a sibling preference policy, there were more than 83 siblings who applied. Even in the first year, the sibling preference policy as stated in the Plan of Operation was not fully implemented because it was not possible, given the other goals of the admissions process, to do so. Siblings who were not admitted under the sibling preference policy remained in the lottery with all other applicants, for a chance at random selection. CT Page 4933
The existence of the sibling preference policy was an important factor in the decision of the plaintiffs to submit applications to WIMS for their children. The plaintiffs not only had to decide whether to "experiment" by sending their children into an entirely new school locale and educational program, but they also had to decide how to manage the different schedules, parental involvement, and sibling expectations this generated within the family. For some families, this created wrenching choices. The knowledge that a sibling preference policy existed was, for many, a crucial factor in the determination to enroll their "lead" child in the school, assured, they felt, that their other children would "follow."
The popularity of the school created difficult choices for the school administration as well. After hearing from representatives of parent-teacher organizations and from two ad hoc committees (the Lottery Committee and the Family Unity Sub-Committee), the Assistant Superintendent prepared a recommendation that the sibling preference policy for admission of Hamden pupils to WIMS be eliminated.[3] The recommendation was presented at a well-publicized and well-attended meeting of the Hamden Board of Education. Members of the public were allowed to comment on the proposed change. The Board then heard from the Superintendent and Assistant Superintendent and debated the policy. Thereafter the Board voted publicly to eliminate the policy, allowing the lottery for the upcoming year to be conducted without any slots reserved for siblings of current pupils.
STANDARD FOR ISSUANCE OF DECLARATORY JUDGMENT
The court is authorized to issue a declaratory judgment in situations in which a party alleges the existence of a "right, power, privilege or immunity . . . whether [it] now exists or will arise in the future." Conn. Prac. Book § 17-54. The plaintiff must show a "danger of loss or of uncertainty as to the party's rights. . . ." Conn. Prac. Book § 17-55(1). Essential to the authority of the court to issue such relief is notice to all whose rights might be implicated by such a declaration. Mannweiler v. LaFlamme, 232 Conn. 27, 33-35 (1995).
The court ordered that notice to all interested persons be made by publication. A legal notice of the pendency of this action and the date of the commencement of the trial was duly CT Page 4934 published in the New Haven Register on March 12, 1999. Thus the notice requirement has been satisfied.
STANDARD FOR ISSUANCE OF AN INJUNCTION
The parties have stipulated that the court may rule on the application of the plaintiffs for both a temporary and permanent injunction. In addition to proving the causes of action alleged in the application, in order to obtain injunctive relief, the plaintiffs must also show that the failure to afford them injunctive relief will result in irreparable harm to them and that they otherwise lack an adequate remedy at law. Hartford v.American Arbitration Association, 174 Conn. 472, 476-77 (1978).
STANDING OF THE PLAINTIFFS
The defendants initially filed a Motion to Dismiss or Alternatively to Strike the application for declaratory and injunctive relief. The court denied that motion without prejudice. The main issue raised in that motion that remains to be resolved is the issue of whether the plaintiffs have standing to challenge the action taken by the Hamden Board of Education and the other defendants.
Standing is established by a showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved by the defendants' actions. Steeneck v. University ofBridgeport, 235 Conn. 572, 579 (1995). Here the plaintiffs claim classic aggrievement, a concept which requires proof that the plaintiffs have a "specific personal and legal interest . . . as distinguished from a general interest, such as is the concern of all members of the community as a whole." Nader v. Altermatt,166 Conn. 43, 51 (1974). The second prong of the test for aggrievement is whether any such interest has been specially and injuriously affected by the challenged action. Id. The determination of aggrievement is usually a question of fact.Steeneck v. University of Bridgeport, supra, 580.
The plaintiffs have presented evidence that the sibling preference policy conferred a type of preferred status on the siblings of current WIMS pupils. That status allowed such a sibling to be placed in a pool of applicants whose statistical chances of admission to WIMS for the upcoming year were greater than the chances of those not in the pool and subject only to the random lottery. The elimination of the sibling preference policy CT Page 4935 eliminated this preferred status and significantly decreased the chances of the sibling being admitted.
The defendants argue that because none of these siblings has yet been denied admission, no specific right has been affected and no legally cognizable injury has occurred.[4] But the concept of standing does not require that the injury to the plaintiffs be at its most severe level before standing is conferred. For example, in New Haven Firebirds Society v. Boardof Fire Commissioners, 32 Conn. App. 585 (1993), some of the plaintiffs who challenged the promotional practices of the fire department had not yet taken and passed the exam which would have rendered them eligible for promotion. The Appellate Court affirmed the finding of the trial court that the plaintiffs were nonetheless aggrieved.
The sibling preference policy of the Board created a group of preferred applicants who now no longer have that status and whose chances of admission are diluted. The members of that group have standing to challenge the policy.
COUNT I — ESTOPPEL
The plaintiffs have sought to prove that the defendants or their agents made specific promises to the families of current pupils that other siblings in the family would be afforded some kind of preference in the admission process for the upcoming or future years. Further the plaintiffs have offered evidence that they relied on these promises to their detriment. The plaintiffs and their witnesses testified that they rearranged their schedules, devoted their energies for committee work and other parental responsibilities, and prepared the expectations of their children to accommodate the near certainty, as they saw it, that, having sent their lead child to WIMS, their other children would follow. Having done so, the plaintiffs allege that the doctrine of estoppel should prevent the Hamden Board of Education from amending the admissions criteria for Hamden applicants.
There are two essential elements to an estoppel — the party must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief; and the other party, influenced thereby, must actually change his position or do some act to his injury which he otherwise would not have done. Moreover, it is the burden of the person claiming the CT Page 4936 estoppel to show that he exercised due diligence to ascertain the truth and that he not only lacked knowledge of the true state of things but had no convenient means of acquiring the knowledge. [internal citations omitted].
Dupuis v. Submarine Base Credit Union, Inc., 170 Conn. 344, 353
(1976). In general, estoppel may not be invoked against the government or a public agency functioning in its governmental capacity. Id.
The one exception to the rule that estoppel cannot be invoked against a governmental agency is that, having proved the two previous elements of estoppel, the plaintiff must show a substantial loss if the municipality were permitted to negate the acts of its agents. Pet Car Products, Inc. v. Barnett,150 Conn. 42, 53 (1962). Courts have held that the application of this exception should be limited and invoked (1) only with great caution, (2) only when the resulting violation has been unjustifiably induced by an agent having authority in such matters, and (3) only when special circumstances make it highly inequitable or oppressive to enforce the regulation in question.Dupuis v. Submarine Base Credit Union, Inc., supra, 354.
In Dupuis, the court considered the claim of the Groton building inspector and zoning officer that the defendant had not obtained the proper permits to construct an office building costing $500,000. The defendant responded that prior to and during the construction, the manager of the project had spoken by telephone to personnel in the building inspector's office and was assured that since the building was being constructed on land of the United States submarine base, no local permits were required. Since the structure was built by and for a private enterprise, however, the fact was that local permits were required. The defendant invoked the doctrine of estoppel, but the Supreme Court rejected that defense. The defendant had failed to show reliance on "an official with authority" as opposed to one who was not authorized to speak on such matters for the building department.
Pet Car Products, Inc. v. Barnett, supra, also involved use of land. During a time when the redevelopment of the Wooster Square area of New Haven was under discussion in 1955, the plaintiff began construction of new cinderblock buildings on lots in the area. In the summer of 1957, the plaintiff relocated its manufacturing operation to the two newly constructed buildings. Meanwhile, the New Haven Redevelopment Agency was surveying the CT Page 4937 area and applying for grants to redevelop it. The next year, after a series of public hearings, the redevelopment plan was approved by the City, resulting eventually in a condemnation proceeding. Rather than contest the proferred compensation, the plaintiff sued, alleging that estoppel applied. The Supreme Court held that the plaintiff had failed to show that the defendant had done anything to induce the plaintiff to act. Knowing that redevelopment was a general threat to urban property owners, the plaintiff could not simply rely on the municipality's issuance of the normal zoning and building permits as a guarantee against the future institution of a redevelopment plan.
The case of Kimberly-Clark Corporation v. Dubno,204 Conn. 146 (1987) shows a proper invocation of the doctrine. The plaintiff requested a specific ruling from the Commissioner of Revenue Services about the tax treatment for the acquisition of certain machinery. The commissioner issued a written ruling to the plaintiff that certain of the items were exempt from taxation, and the plaintiff acquired and installed the machinery based on that ruling. Thereafter the plaintiff was charged a tax on the items and filed an administrative appeal. The Supreme Court held that the plaintiff was justified in relying on the specific written ruling issued by the authorized governmental officer in that case. The commissioner was not allowed to reverse his earlier position.
When viewed in light of the principles of estoppel and the Connecticut cases construing those principles, the plaintiffs' claims fail because they have not proved reasonable reliance.
First, the sibling preference policy was part of a larger document that contained other policies that were of equal or greater importance, the implementation of which could interfere with the ability to fully implement the sibling preference policy. One such policy was the necessity of having a student body that reflected the racial demographics of the community, a policy set forth in all of the same documents allegedly relied on by the plaintiffs. Another such policy, not set forth in the Plan of Operation or the interdistrict Agreement but well known to all, was the policy of reserving as large a number of slots as feasible to relieve classroom overcrowding in some of the other Hamden schools. It was always apparent that the number of spaces for pupils at WIMS was finite and that the number of applicants was always likely to exceed the number of available slots. Even among some of the plaintiffs, it was apparent that at some point CT Page 4938 the number of eligible siblings might exceed the number of slots available. It was a therefore a distinct possibility that a sibling who might otherwise be preferred would not be invited to attend because there was simply no space. Because it was apparent upon a simple analysis of the numbers that, if not in the first year then in the years following, it would be a practical impossibility to guarantee all siblings a space, the sibling preference policy was not the kind of statement on which reasonable reliance could be placed.
Second and closely related, the sibling preference was never termed anything but a preference. There is no evidence that it was ever termed a "guarantee" or that it was the basis for a specific promise of a placement to any pupil or family. The evidence presented by the plaintiffs was that that at most it was recognized as giving the eligible sibling of a current pupil a statistical advantage in the lottery. The policy of sibling preference was not sufficiently specific and definite to induce the kind of reliance necessary to prove estoppel.
Third, the policy was just that — a policy. It was not specific to any pupil or family. To the extent it was incorporated in the Plan of Operation, it coexisted with other policies such as the length of the school day for kindergartners and the type of reading test to be administered to second-graders. It is entirely reasonable to expect that changes to such a document would be made by the partners and the administration of WIMS. Reliance that no future changes would be made was unreasonable.
It is true that some families inquired further and received what they took to be assurances from Ed Mackniak, a Hamden school principal who had been temporarily assigned to coordinate the opening of WIMS until permanent staff was in place. Mackniak was not authorized to set policy for the school and never held himself out as able to do so. The inquiries to him were all oral and informal. None could be characterized as more than a request that he provide an interpretation of the sibling preference policy then in existence. He made no misrepresentations and he issued no guarantee of admission for any specific pupil.
Finally the harm experienced by the plaintiffs meets neither the "highly inequitable or oppressive" test in Dupuis, supra, nor even the irreparable harm threshold for the issuance of an injunction. The plaintiffs made difficult choices about CT Page 4939 educational placements for their children based on an expectation that the sibling preference policy would remain indelible and would be applied to their families in a certain way. These families and some of their children may now experience some disruption. But none of this approaches the special circumstances required to estop a governmental action.
COUNT II — LACK OF AUTHORITY OF THE HAMDEN BOARD OFEDUCATION
The plaintiffs allege that under the terms of the WIMS Plan of Operation which was required to be approved by the Connecticut Department of Education all decisions concerning the policy of sibling preference in pupil selection had been entirely ceded to the Steering Committee and were no longer controlled by the Board of Education. The response of the defendants is that neither the Plan of Operation nor the interdistrict Agreement so provide, and that it was not the understanding of the Board or the Steering Committee that such a delegation of authority either had been made or could lawfully be made.
The original Plan of Operation provides for a sibling preference policy but is silent as to who or what entity is to oversee and implement the policy. It is undisputed that each of the partners continued to control and implement all other aspects of the pupil selection process, in particular the entire lottery procedure. The evidence is that the Steering Committee interpreted the interdistrict Agreement and the Plan of Operation to mean that each town ran its own lottery and that each town was otherwise entirely in control of the selection of pupils from that town. Only once the lawsuit raised the issue of whether this was a correct interpretation did either the Steering Committee or the Hamden Board of Education take formal steps to clarify their existing interpretations of who had the authority and how it should be exercised. During the pendency of this litigation, the Steering Committee voted on March 18, 1999, to amend the Plan of Operation to reflect the interpretation under which all had been functioning:
The amendment states:
Families may submit applications for more than one sibling as a part of the application process. Each partnership district may determine annually whether, and to what extent, sibling preference will be utilized in selecting CT Page 4940 applicants from its district to be invited to enroll in the school.
That change in the Plan of Operation was approved by the State Department of Education on March 26, 1999.
The Hamden Board of Education has determined for the 1999-2000 school year that sibling preference will not be utilized in selecting applicants from its district. The fact that the Board took the vote prior to the Steering Committee's amendment to the Plan of Operation is immaterial. See, John J.Brennan Construction Corporation, Inc. v. Shelton, 187 Conn. 695,712 (1982); Norwalk v. Board of Labor Relations, 206 Conn. 449,453 (1988). It is clear that the authority to decide whether or not to employ sibling preference for Hamden pupils lies with the Hamden Board of Education and that the Board has spoken on that issue for the upcoming school year.
COUNT III — MISREPRESENTATION
The plaintiffs have sought to prove that the Assistant Superintendent made misstatements to the Hamden Board of Education during the meeting at which the Board voted to eliminate the sibling preference policy. They allege that she told the Board that no promises had been made to any parents about the placement of siblings for the upcoming school year. Leaving aside the issue of whether the claim, if true, is one on which injunctive or declaratory relief could be granted, the court finds the plaintiffs have failed to prove any such misstatement.
CONCLUSION
The plaintiffs have failed to meet their burden of showing that the defendants acted unlawfully in eliminating the sibling preference policy for Hamden applicants to the Wintergreen Interdistrict Magnet School for the 1999-2000 school year. The court declines to declare any action of the defendants to be unlawful and declines to enter any injunctive relief. Judgment shall enter for the defendants.
Patty Jenkins Pittman, Judge